# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JOANNE PILKENTON ROBINSON,** | ) | |
| Plaintiff | ) | Civil Action No. 2:23cv00003 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MARTIN J. O'MALLEY,**[1] | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |
| | ) | |

*I. Background and Standard of Review*

Plaintiff, Joanne Pilkenton Robinson, ("Robinson"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen,*

---

[1] Martin J. O'Malley, ("O'Malley"), became the Commissioner of Social Security on December 20, 2023. Pursuant to Federal Rules of Civil Procedure Rule 25(d), O'Malley should, therefore, be substituted for Kilolo Kijakazi as the defendant in this case. Pursuant to the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), no further action is required to continue this suit.

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Robinson protectively filed an application for DIB on May 13, 2021, alleging disability as of April 12, 2021, due to clubfoot; mobility issues; hypertension; high cholesterol; and sciatica. (Record, ("R."), at 15, 143-44, 170, 210.) The claim was denied initially and on reconsideration. (R. at 75-78, 80-81, 87-90.) Robinson requested a hearing before an administrative law judge, ("ALJ"). (R. at 93-94.) A hearing was held on August 24, 2022, at which Robinson was represented by counsel. (R. at 31-52.)

By decision dated September 8, 2022, the ALJ denied Robinson's claim. (R. at 15-26.) The ALJ found Robinson meets the nondisability insured status requirements of the Act for DIB purposes through September 30, 2026. (R. at 17.) The ALJ found Robinson had not engaged in substantial gainful activity since April 12, 2021, the alleged onset date.[2] (R. at 17.) The ALJ determined Robinson had severe impairments, namely, residuals of a clubfoot defect; obesity; lumbago with mild degenerative disc disease; hypertension; and arthritis, including the left knee, but he found Robinson did not have an impairment or combination of

---

[2] Therefore, Robinson must show that she became disabled between April 12, 2021, her alleged disability onset date, and September 8, 2022, the date of the ALJ's decision, to be eligible for benefits.

impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17, 20.)

The ALJ found Robinson had the residual functional capacity to perform sedentary[3] work, except she could have no exposure to unprotected heights; she could occasionally perform postural activities and operate foot controls; she required a sit/stand option every 30 minutes without leaving the workstation or abandoning task; and she was limited to occasional exposure to vibrations and other hazards.[4] (R. at 21, 48-49.) The ALJ found Robinson was able to perform her past relevant work as a secretary and as a medical biller. (R. at 25, 48-49.) Thus, the ALJ concluded Robinson was not under a disability as defined by the Act, from April 12, 2021, through the date of the decision, and she was not eligible for DIB benefits. (R. at 25.) *See* 20 C.F.R. § 404.1520(f) (2022).

After the ALJ issued his decision, Robinson pursued her administrative appeals, (R. at 248-49), but the Appeals Council denied her request for review. (R. at 1-5.) Robinson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2022). This case is before this court on Robinson's motion for summary judgment filed May 19, 2023, and the Commissioner's motion for summary judgment filed June 30, 2023.

---

[3] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2022).

[4] The ALJ noted that a cane was not medically necessary, and Robinson denied use of a cane. (R. at 21.)

*II. Facts*[5]

Robinson was born in 1965, (R. at 143), which classifies her as a "person of advanced age" under 20 C.F.R. § 404.1563(e). She has some college education and past relevant work as a secretary, a medical billing clerk, a customer service representative and a bank teller. (R. at 37-38, 171.)   Robinson testified at her hearing that she used prescription ibuprofen for pain. (R. at 39.) She stated she did not use a cane, an assistive device or walker.[6] (R. at 39.) Robinson stated that she could stand up, but she could not balance due to her clubfoot. (R. at 43.) She stated she had fallen four times over the past year. (R. at 43.)   Robinson stated she could sit up to 40 minutes without interruption. (R. at 42.) She stated sitting worsened her hip joint and lower back pain. (R. at 42.)

In rendering his decision, the ALJ reviewed records from Dr. Robert McGuffin, Jr., M.D., a state agency physician; Dr. Joseph Duckwall, M.D., a state agency physician; Appalachian Orthopaedics Associates, P.C.; Watauga Orthopaedics, PLC; Wellmont Medical Associates, ("Wellmont"); Norton Community Hospital; and Rebecca O'Quinn, N.P., a nurse practitioner.

By way of background, Robinson was hospitalized multiple times from birth to age 16 due to clubfoot with multiple surgeries on the right from birth to age

---

[5] Robinson's only dispute is with respect to the ALJ's assessment of her physical limitations. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-15). Therefore, the court will address the facts relevant to Robinson's physical residual functional capacity.

[6] When asked if she used a cane, an assistive device or walker, Robinson stated, "… I'm pretty stubborn about things, no. I don't use anything." (R. at 39.)

seven. (R. at 350-51.) Robinson has had hypertension since 1990, and in 2000, she was admitted to Mountain View Hospital for chest pain. (R. at 351.)

From February through May 2018, Robinson saw Lawrence Livengood, PA-C, a certified physician's assistant, and Dr. John H. Phillips, M.D., a physician with Appalachian Orthopaedics Associates, P.C., for right knee pain and isolated mechanical locking and knee buckling. (R. at 250-52, 255, 257.) Robinson reported she had difficulty walking or climbing stairs, and she ambulated without assistance. (R. at 251, 253, 256, 258.) Robinson reported trauma to her right knee at the age of 15 that took her a while to recover. (R. at 259.) She stated she had done well until her knee started giving way. (R. at 259.) Robinson stated walking aggravated her right knee. (R. at 259.) Robinson reported swelling in the extremities, but denied muscle aches, weakness, arthralgias or joint pain. (R. at 259.)

Upon examination, Robinson was in no acute distress; she had normal gait and ambulated without assistive devices; her right knee exhibited no joint line tenderness, bony tenderness or other soft tissue tenderness; she had full active range of extension with pain in the end range of flexion; she had full passive range of motion with pain in the end of flexion; she had intact sensation to the lower extremity; she had a palpable pulse in the foot; she had full strength of the knee extensors and resisted straight leg raising; and she had positive anterior drawer and Lachman's testing.[7] (R. at 254, 259-60.) An MRI of Robinson's right knee was ordered. (R. at 260.) Robinson was referred for physical therapy. (R. at 257.) She stated that, although physical therapy was not helping, she felt a bit stronger in the knee, but her knee continued to give way daily. (R. at 254.) Livengood diagnosed

---

[7] In February 2018, anterior drawer and Lachman's testing were negative.  (R. at 260.)

chronic instability of the right knee. (R. at 254.) Dr. Phillips noted that Robinson's symptoms were from an anterior horn lateral meniscal tear of the right knee, and she had tricompartmental right knee arthritis, which was asymptomatic. (R. at 252.) Dr. Phillips diagnosed right knee pain. (R. at 252.) Robinson chose to observe her symptoms. (R. at 252.)

From May 2020 through January 2022, Robinson was seen sporadically by Karen J. Stallard, F.N.P., a family nurse practitioner with Wellmont, for follow up of hypertension and hyperlipidemia and complaints of foot, knee and back pain. (R. at 287, 298, 415, 431.) She stated her left foot hurt, and her right foot went to sleep with walking and standing. (R. at 298.) Upon examination, Robinson walked with a limp; she had a right clubfoot; and her left foot had swelling around the ankle and tenderness across the top of the foot and ankle.[8] (R. at 300.) X-rays of Robinson's left ankle showed a prominent calcaneal spur and calcific tendinitis of the Achilles tendon; congenital deformity of the third and fourth metatarsal bones; and diffuse soft tissue swelling of the ankle. (R. at 327-28.) Robinson declined physical therapy. (R. at 298.)

On June 3 and 9, 2020, Robinson was seen by Dr. Karen J. McRae, M.D., and Rachel Taylor, PA-C, a certified physician's assistant, at Watauga Orthopaedics, PLC, reporting left ankle and foot pain. (R. at 269, 272.) Robinson reported arthralgias and joint pain, but denied muscle aches, weakness and swelling in her extremities. (R. at 270.) Upon examination, Robinson was in no acute distress; she was obese; her left lower extremity pulses were normal; she exhibited no edema or varicosities in her left foot; her capillary refill test was

---

[8] In January 2021, Robinson's musculoskeletal system had normal range of motion with no tenderness or edema. (R. at 290.)

Case 2:23-cv-00003-JPJ-PMS   Document 17   Filed 01/22/24   Page 7 of 22
Pageid#: 520

normal; she walked with a limp and antalgic gait, but used no assistive device; she had tenderness in her left ankle and in the Achilles tendon; she had normal active range of motion of the toes; she had 5/5 strength; she had brachymetatarsia[9] of the third and fourth metatarsals; she had profound right calf atrophy; she exhibited some discomfort over the calcaneocuboid joint, as she had fixed claw toe deformities of the lesser digits; she had normal sensation; her right lower extremity demonstrated ankle dorsiflexion to neutral through pull of the extensor hallucis longus, ("EHL"), tendon; varus valgus stress testing did not cause any significant discomfort; and she had no tenderness over the peroneal or posterior tibial tendons. (R. at 270, 273.) Dr. McRae diagnosed bilateral ankle pain; congenital talipes equinovarus, right; and degenerative joint disease of the left ankle and foot. (R. at 271.) Shoe inserts were recommended. (R. at 271.)

On May 18, 2020, x-rays of Robinson's left ankle showed no acute bone or joint abnormalities of the ankle or foot, significant calcific tendinitis of the Achilles tendon and calcaneal spur in the hindfoot; soft tissue swelling of the ankle with small arterial calcifications of the ankle; and congenital deformity of the third and fourth metatarsals. (R. at 326-27.)

On December 29, 2020, Robinson presented to the emergency department at Norton Community Hospital, complaining of back pain after falling on ice. (R. at 292-96.) Upon examination, Robinson's musculoskeletal system had normal range of motion with no tenderness or deformity; she had intact sensation and motor function; she had a positive Romberg sign; her gait was intact; and her deep tendon

---

[9] Brachymetatarsia is a condition in which one of the bones in the front of the foot is significantly shorter than the others. *See* https://www.foothealthfacts.org/conditions/brachymetatarsia (last visited Jan. 17, 2024).

reflexes were normal and symmetric. (R. at 294-95.) A CT scan of Robinson's pelvis showed inflammatory fat stranding in the right flank, likely representing a contusion; a nonobstructing right nephrolithiasis; and right renal cortical scarring. (R. at 295.)

On August 27, 2021, Rebecca O'Quinn, N.P., a nurse practitioner, examined Robinson at the request of Disability Determination Services. (R. at 350-55.) Robinson presented with a history of clubfoot, mobility problems, back problems, hypertension and cholesterol. (R. at 350.) Robinson complained of stiffness and numbness related to her clubfoot. (R. at 350.) She stated she walked on her heels at times due to pain in her bilateral knees and hips. (R. at 350.) Robinson stated her hypertension was normally controlled with medication, except when she had increased pain or was nervous. (R. at 350.) Upon examination, Robinson's gait was abnormal; she could not walk on her right toes and walked on her right heel with difficulty, unstable; she could walk on her left toes and left heel without difficulty; she could perform a full squat, but was unsteady rising from a squat; stance standing and Romberg standing were normal; she had no assistive device; her ability to hop was unsteady; she needed no assistance getting on the examination table; she could rise from sitting without difficulty; her straight leg raising was negative, bilaterally; her right ankle and left hip were unstable; she had swelling of the left ankle with no trigger points; her deep tendon reflexes were physiologic and equal in her upper and lower extremities; her sensation was intact; she had 5/5 strength in her upper and lower extremities; her heel-to-shin testing was normal; her extremities had no cyanosis, clubbing or edema; and she had muscle atrophy of the right leg, with the right calf measuring 24 centimeters and the left calf measuring 32 centimeters. (R. at 352-53.) O'Quinn diagnosed low back pain; right

clubfoot with stiffness and immobility; hip pain with left hip instability; hypertension; and elevated cholesterol. (R. at 354.)

O'Quinn opined Robinson should use a cane as medically necessary for long distances and uneven terrain; she could lift items weighing up to 10 pounds with her free hand; she could stand 30 minutes in an eight-hour workday, walk an hour in an eight-hour workday and sit for two hours in an eight-hour workday; she could occasionally lift and carry items weighing 11 to 20 pounds and frequently lift and carry items weighing less than 10 pounds; she could reach overhead and in front occasionally; she could occasionally push and pull, climb stairs and ramps and balance; she should never climb ladders or scaffolds, stoop, kneel, crouch, crawl or work at unprotected heights; and she could occasionally work around moving mechanical parts. (R. at 354.)

On September 1, 2021, x-rays of Robinson's lumbar spine showed mild degenerative disc disease at the L5-S1 level. (R. at 357.) That same day, x-rays of Robinson's right knee showed mild tricompartmental osteoarthritis. (R. at 358.)

On September 26, 2021, Dr. Robert McGuffin, Jr., M.D., a state agency physician, completed a medical assessment, finding Robinson could perform sedentary work. (R. at 60-61.) He found Robinson could occasionally lift and carry items weighing 10 pounds and frequently lift and carry items weighing less than 10 pounds; she could stand and/or walk two hours in an eight-hour workday;[10] she

---

[10] Dr. McGuffin noted Robinson was limited to standing/walking two hours in an eight-hour workday due to right clubfoot with pain, stiffness and difficulty with mobility. (R. at 60.)

could sit six hours in an eight-hour workday; she required a sit/stand option;[11] she could push and pull with the upper extremities as much as the lift/carry restrictions; she could occasionally push/pull with the bilateral lower extremities;[12] she could frequently balance; she could occasionally climb ramps and stairs and stoop; never climb ladders, ropes or scaffolds, kneel, crouch and crawl;[13] she should avoid concentrated exposure to vibration;[14] and she should avoid even moderate exposure to hazards, such as machinery and heights. (R. at 60-61.) Dr. McGuffin indicated no manipulative, visual or communicative limitations. (R. at 60-61.) Dr. McGuffin reported Robinson required an assistive device for ambulation over long distances, but should always have an assistive device with her to help with transfers/balance. (R. at 60.)

On December 28, 2021, Dr. Joseph Duckwall, M.D., a state agency physician, completed a medical assessment, which mirrored that of Dr. McGuffin, except he found Robinson could occasionally climb, stoop, kneel, crouch and crawl. (R. at 70-71.)

---

[11] Dr. McGuffin noted that walking and standing worsened Robinson's bilateral hip pain, and she must change positions constantly when sitting. (R. at 60.)

[12] Dr. McGuffin noted Robinson was limited to occasional pushing/pulling with the bilateral lower extremities due to atrophy from clubfoot and chronic, bilateral knee pain from a prior surgery. (R. at 60.)

[13] Dr. McGuffin noted Robinson was limited to frequent, not constant, balancing due to mobility issues and, because of her lumbar degenerative disc disease and history of knee osteoarthritis with chronic bilateral knee pain, she could occasionally climb ramps and stairs and stoop, but never kneel, crouch, climb ladders, ropes or scaffolds or crawl. (R. at 60.)

[14] Dr. McGuffin noted Robinson should avoid concentrated exposure to vibration to protect her current musculoskeletal functioning. (R. at 61.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2022). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2022).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether

substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Robinson argues that the ALJ's decision is not based on substantial evidence. (Plaintiff's Brief at 6-15.) Robinson argues the ALJ failed to properly address the opinions of O'Quinn and Drs. Duckwall and McGuffin, in that the ALJ failed to properly address the need for a cane when ambulating long distance and to help with transfer and balance. (Plaintiff's Brief at 7-12.) Robinson also argues that the ALJ erred by failing to give appropriate credence to her allegations and properly assess the effect of pain on her ability to perform substantial gainful activity. (Plaintiff's Brief at 12-15.)

Robinson filed her application in May 2021; thus, 20 C.F.R. § 404.1520c governs how the ALJ considered the medical opinions here.[15] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. § 404.1520c(a) (2022). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2022) (emphasis added). Moreover, when a medical

---

[15] 20 C.F.R. § 404.1520c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2022).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. § 404.1520c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[16]  *See*  20  C.F.R.  § 404.1520c(b)(2).

A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 404.1545(a) (2022). The ALJ found

---

[16] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(b)(3) (2022).

Robinson had the residual functional capacity to perform sedentary work, except she could have no exposure to unprotected heights; she could occasionally perform postural activities and operate foot controls; she required a sit/stand option every 30 minutes without leaving the workstation or abandoning task; and she was limited to occasional exposure to vibrations and other hazards. (R. at 21.)

Robinson argues that the ALJ did not properly consider her allegations of pain. Contrary to Robinson's argument, the Commissioner contends that substantial evidence supports the ALJ's finding that Robinson's statements about the intensity, persistence and limiting effects of her symptoms were inconsistent with the record. It is noted that Robinson did not cite to record evidence that would support further limitations or otherwise undermine the ALJ's decision.

The Fourth Circuit recently reiterated the two-step framework, set forth in 20 C.F.R. § 404.1529 and Social Security Ruling, ("S.S.R."), 16-3p, 2017 WL 5180304 (Oct. 25, 2017), for evaluating a claimant's symptoms, such as pain.[17] *See Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020). First, the ALJ must determine whether objective medical evidence[18] presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. *Arakas*, 983 F.3d at 95 (citations omitted); *see also Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the

---

[17] "Symptoms" are defined in the regulations as a claimant's own description of her medical impairment. *See* 20 C.F.R. § 404.1502(i) (2022).

[18] The regulations define "objective medical evidence" as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. § 404.1529(c)(2) (2022).

alleged symptoms to determine how they affect the claimant's ability to work and whether she is disabled. *See Arakas*, 983 F.3d at 95 (citations omitted); *see also Craig*, 76 F.3d at 595. Because "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," ALJs must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. S.S.R. 16-3p, 2017 WL 5180304, at *5; *see also* 20 C.F.R. § 404.1529(c)(2); *Craig*, 76 F.3d at 595. In other words, "while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989); *see also Craig*, 76 F.3d at 593.

However, the Fourth Circuit has held that objective medical evidence and other objective evidence are "crucial" in evaluating the second prong of the symptom analysis test. *Craig*, 76 F.3d at 595. In *Craig*, the Fourth Circuit stated, "[a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." 76 F.3d at 595. Specifically, the ALJ must consider "any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [her medical] history, the signs and laboratory findings, and statements by [her] medical sources or other persons about how [her] symptoms affect [her]." 20 C.F.R. § 404.1529(c)(4) (2022). The regulations direct that a claimant's

"symptoms, including pain, will be determined to diminish [her] capacity for basic work activities to the extent that [her] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4).

Here, the ALJ stated as follows in his decision:

… [T]he undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p.

… In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable … impairment[s] … that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying … impairment[s] that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

(R. at 21-22.) Robinson contends that the ALJ failed to properly evaluate her allegations, as he considered records from three years prior to the alleged onset date. (Plaintiff's Brief at 13.) Robinson provided records from 2018 to 2022 of examinations of her knee, back and foot pain, but, as the ALJ noted, the medical records did not show significant worsening pathology or findings. (R. at 24.) The ALJ noted that Robinson had no treatment for any of her orthopedic conditions

-16-

since the alleged onset date. (R. at 24.) Although the records ranged from 2018 through 2022, the bulk were before the alleged onset date, but it appears the ALJ analyzed and took into consideration all the medical records. (R. at 22-25.) Examinations from 2018 show marked right calf atrophy and pain in the end range of motion, but no pain with movement; normal gait and posture; full strength; no effusion, warmth or erythema; and ambulation without assistive devices, despite a chronic anterior cruciate ligament, ("ACL"), tear, and giving way of the right knee. Follow-up visits showed reports of no improvement from physical therapy, but a stronger feeling in the knee. The ALJ noted that, in September 2021, x-rays of Robinson's lumbar spine showed no more than mild degenerative disc disease at the L5-S1 level, and x-rays of her right knee showed mild tricompartmental osteoarthritis. (R. at 23.) Consistent with these findings, the ALJ noted that O'Quinn's assessment was not supported by or consistent with Robinson's own testimony and objective examination findings. (R. at 24.)  Thus, the ALJ explicitly set out the appropriate, two-step legal framework for considering Robinson's allegations of pain in his decision.

The ALJ next turned to an analysis of Robinson's symptoms, stating, in part, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. …" (R. at 23.) Thus, the ALJ satisfied the first part of the two-part test for analyzing Robinson's allegations about her symptoms. *See Arakas*, 983 F.3d at 95; *Craig*, 76 F.3d at 594. The real issue, therefore, is whether he correctly analyzed Robinson's pain under the second part of this test. For the reasons that follow, I find that he did.

In his decision, the ALJ stated, "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (R. at 23.) The ALJ noted that treatment record indicated conservative treatment for hypertension, obesity, anxiety and depression with medications, physical exercise and lifestyle changes. (R. at 24.) He noted that Robinson testified at her hearing that physical and mental symptoms were severe in nature and caused ongoing physical, mobility, exertional and mental restrictions. (R. at 24.) However, he noted the record of evidence, including additional medical records received covering treatment through early 2022, showed no significant worsening pathology or findings. (R. at 24.) The ALJ noted Robinson's consultative examination also yielded no acute physical deficits or restrictions, and she received no treatment for any of her orthopedic conditions since the alleged onset date. (R. at 24.)

In making his residual functional capacity finding, the ALJ found the assessments of the state agency physicians mostly persuasive, as they were supported by and consistent with radiology and physical findings noting history of clubfoot, antalgic gait, degenerative lumbar findings and osteoarthritis. (R. at 23-24.) The ALJ found O'Quinn's opinion unpersuasive, as the limitations in sitting, reaching, pushing/pulling and need for a cane at times was not support by or consistent with Robinson's own testimony, objective examinations and findings of providers that showed adequate ambulation with mild antalgic gait and radiology findings that showed no more than mild osteoarthritis or degenerative spine findings. (R. at 24.) As noted, the ALJ considered the objective medical evidence and Robinson's treatment history. (R. at 22-25.) *See* S.S.R. 16-3p, 2017 WL 5180304, at *4-5, 7-8 (stating that medical evidence and treatment history are two factors for the ALJ to consider when evaluating subjective allegations). First, the

ALJ explained that Robinson had no significant worsening in pathology or findings. As the ALJ found, "the record of evidence including additional medical records received covering treatment through early 2022 shows no significant worsening pathology or findings." (R. at 24). Contrary to Robinson's contention that the ALJ's use of records from three years prior to the alleged onset date was not a proper evaluation of her allegation, the ALJ analyzed all the records provided. (R. at 22-25.) Although the records ranged from 2018 through 2022, the bulk were before the alleged onset date; but all were analyzed and considered in the evaluation (R. at 24.)

Examinations from 2018 showed marked right calf atrophy and pain in the end range of motion, but no pain with movement; normal gait and posture; full strength; no effusion, warmth, or erythema; and ambulation without assistive devices despite a chronic ACL tear and giving way of the right knee. (R. at 252, 254-55, 257, 259-60.) Follow-up visits showed reports of no improvement from physical therapy, but a stronger feeling in the knee. (R. at 254.) In 2020 and early 2021, Robinson reported back, knee, and foot pain to Wellmont, but around the same time, she reported left foot, but no back pain, to Watauga Orthopaedics. (R. at 273, 287-302.) It was also during this period that Robinson fell on ice and complained of back pain, but examination findings showed normal range of motion, sensation, motor function, muscle tone, reflexes and gait. (R. at 292, 294-95.) After the alleged onset date, x-rays showed no acute abnormalities and only "mild" conditions in the lumbar spine and right knee. (R. at 357-58.)

Second, the ALJ concluded the record "as a whole . . . does not reveal historical medical treatment one would expect for a totally disabled individual." (R. at 25.) The ALJ specifically pointed out that "[t]here is essentially no treatment

for any of her orthopedic conditions since the alleged onset date." (R. at 24.) In 2018, treatment recommendations included the conservative plan of anti-inflammatory medications, a knee brace and physical therapy. (R. at 257.) Although Robinson reported no improvement with physical therapy, she stated she did feel her knee was stronger. (R. at 254.) Later, in 2020, Robinson declined physical therapy, and her treatment recommendation was shoe inserts. (R. at 271-72, 298.) The ALJ noted that the records "cite no more than conservative treatment." (R. at 24.)

Next, Robinson argues the ALJ failed to properly address the opinions of O'Quinn and Drs. Duckwall and McGuffin, in that the ALJ failed to properly address the need for a cane when ambulating long distance and to help with transfer and balance. (Plaintiff's Brief at 7-12.) Pursuant to 20 C.F.R. § 404.1530, a claimant must follow prescribed medical treatment if it is expected to restore the claimant's ability to work, unless the claimant has a good reason for not doing so. An ALJ may not deny disability benefits based on a claimant's noncompliance with prescribed treatment unless the claimant has had a full opportunity to express the specific reasons for his noncompliance. *See Blumberg v. Comm'r of Soc. Sec.*, 2005 WL 2453104, at *4 (W.D. Va. Oct. 4, 2005) (citing *Nunley v. Barnhart*, 296 F. Supp. 2d 702 (W.D. Va. 2003)); *see also* Social Security Ruling, ("S.S.R."), 82-59, 1982 WL 31384, at *2 (Jan. 1, 1982) (stating that the record must reflect as clearly and accurately as possible the claimant's reason(s) for failing to follow the prescribed treatment). The ALJ found a cane was not medically necessary, and Robinson denied use of a cane. (R. at 21.) In fact, at her hearing, when asked if she used a cane, an assistive device or walker, Robinson stated, "…I'm pretty stubborn about things, no. I don't use anything." (R. at 39.) The medical records also indicate that Robinson did not present with an assistive device.

Based on this, I find substantial evidence exists to support the ALJ's consideration of the medical evidence and his residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence exists in the record to support the ALJ's consideration of the medical evidence;

2.    Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3.    Substantial evidence exists in the record to support the Commissioner's finding that Robinson was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Robinson's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioners decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written

objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      January 22, 2024.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE